[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus Bar Assn. v. Cable*, Slip Opinion No. 2026-Ohio-89.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-89

COLUMBUS BAR ASSOCIATION *v.* CABLE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus Bar Assn. v. Cable*, Slip Opinion No. 2026-Ohio-89.]**

*Attorneys—Violations of the Rules of Professional Conduct—Paying companies to solicit and refer clients and failing to supervise the companies' nonlawyers representing his firm—One-year license suspension conditionally stayed.*

(No. 2025-0205—Submitted June 4, 2025—Decided January 15, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-016.

_____

The per curiam opinion below was joined by FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ. KENNEDY, C.J., concurred in part and dissented in part, with an opinion joined by LELAND, J. DAVID J. LELAND, J., of the Tenth District Court of Appeals, sitting for BRUNNER, J.

**Per Curiam.**

{¶ 1} Respondent, Brian Matthew Cable, of Cincinnati, Ohio, Attorney Registration No. 0086248, was admitted to the practice of law in Ohio in 2010.

{¶ 2} In a July 2024 complaint, relator, the Columbus Bar Association, charged Cable with professional misconduct. In a two-count complaint, relator alleged that Cable violated four professional-conduct rules arising from his agreement to pay two companies to solicit and refer clients to him and his failure to supervise the nonlawyer representatives of one of those companies to ensure their compliance with the Ohio Rules of Professional Conduct.

{¶ 3} Cable waived a probable-cause determination. The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors. They also submitted 18 stipulated exhibits and jointly recommended that Cable be publicly reprimanded for his misconduct. Cable and one character witness testified at a hearing before a three-member panel of the Board of Professional Conduct.

{¶ 4} After the hearing, the panel issued a report, finding by clear and convincing evidence that Cable had committed the charged misconduct. Although the panel adopted the aggravating and mitigating factors stipulated by the parties and acknowledged Cable's full cooperation in the disciplinary proceedings, the panel credited relator's representation that lawyers' use of marketing firms to solicit legal clients is pervasive in Ohio and concluded that issuing a public reprimand would not sufficiently deter the conduct and protect the public. The panel therefore recommended that Cable be suspended from the practice of law for one year with six months stayed on the condition that he refrain from further misconduct and that he be required to work with a monitoring attorney for one year following his reinstatement to the practice of law. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction with the additional condition that Cable be required to pay the cost of these proceedings.

{¶ 5} Cable objects to imposition of an actual suspension, arguing that the board inappropriately enhanced its recommended sanction based on a fact not in evidence—namely, the alleged pervasive use of marketing firms to solicit legal clients in Ohio. He argues that based on the specific facts of this case, the public reprimand proposed by the parties is the appropriate sanction here. Relator supports Cable's objections and urges this court to impose a public reprimand for Cable's misconduct.

{¶ 6} For the reasons that follow, we adopt the board's findings of misconduct, sustain Cable's first objection in part and sustain his second objection, and suspend Cable from the practice of law for one year with the entire suspension stayed on the conditions that he commit no further misconduct, serve a one-year period of monitored probation focused on law-office management, and pay the costs of these proceedings.

**FINDINGS OF FACT AND MISCONDUCT**

**Count One—Solicitation for professional employment**

{¶ 7} Cable is a sole practitioner whose law practice consists primarily of personal-injury cases arising from automobile accidents. In early 2023, relator was investigating another lawyer who was believed to be paying out-of-state solicitation networks for personal-injury referrals. In response to a subpoena for bank records in that case, relator obtained copies of checks paid from the account of Brian Cable Law, L.L.C., to Bayshore Discoveries, L.L.C.

{¶ 8} Relator contacted the Cincinnati Bar Association to determine which association should investigate Cable's conduct. The Cincinnati Bar Association informed relator that it had received a similar grievance concerning Cable. Submitted with that grievance was an 11-minute recorded telephone conversation during which a purported representative of Cable's law firm solicited a Columbus accident victim and offered to provide him with legal representation. Based on the location of the grievant and the information obtained during relator's other

investigation, the bar associations agreed that relator would conduct the investigation into Cable's conduct.

{¶ 9} The evidence shows that sometime in 2022, Bayshore contacted Cable, offering to market his legal services and refer clients to him for $75 per client matter. In response to relator's initial letter of inquiry regarding the checks that Cable had issued to Bayshore, Cable explained that based on his work experience with other law firms when he was a new lawyer, he wrongly believed that he was permitted to pay companies like Bayshore a fee for referring clients to him.

{¶ 10} In a second letter of inquiry, relator requested that Cable produce any communications that he had had with "any referral service," along with any agreements that he had entered into with those services. In response, Cable disclosed that he had been contacted by another marketing company, Legal Management Services, and an affiliated presettlement-funding company, Accident Advance & Resource Center (collectively, "LMS"). Cable stated that he began using LMS's marketing services in summer 2022, about the same time that he began using Bayshore's services. He agreed to pay LMS $250 for each client referred to him. That fee later increased to $300. Cable informed relator that his agreements with the marketing firms were not memorialized in writing. After relator commenced its investigation, and on the advice of counsel, Cable terminated his relationships with Bayshore and LMS.

{¶ 11} According to the parties' stipulations and Cable's disciplinary-hearing testimony, Bayshore and LMS are both Florida companies that purchased police reports to identify potential personal-injury clients. Nonlawyer representatives of both companies then solicited the accident victims by telephone and referred them to preferred-network chiropractic clinics and attorneys, like Cable.

{¶ 12} During the solicitation calls, the marketing-company representatives would send four electronic documents to interested accident victims. Those documents, presented on Cable's firm letterhead, consisted of an attorney-retention agreement, a power of attorney, a medical-release authorization, and a nonsolicitation agreement. Potential clients would electronically sign each of the documents before speaking with an attorney and before the attorney reviewed their cases.

{¶ 13} Cable acknowledged that his office prepared three of those documents but stated that the marketing companies prepared the nonsolicitation agreements. Those agreements state, "I, _____, have requested to meet with a representative of Brian Cable Law. I have not been solicited by anyone affiliated with Brian Cable Law or by any person claiming to be a representative of Brian Cable Law." Cable reviewed the nonsolicitation agreements and knew that his clients were signing them after they had been solicited by a marketing firm.

{¶ 14} Relying on the representations of Bayshore and LMS that the solicitation process was permissible legal marketing, Cable accepted the companies' proposals and began to knowingly receive client referrals from those firms.

{¶ 15} Bayshore verbally informed Cable of the amounts he owed for its client referrals. From October 2022 through April 2023, Cable issued three checks from his operating account to Bayshore. Those checks totaled $8,325 and represented the referral fees for 111 client legal matters.

{¶ 16} LMS sent Cable periodic invoices, identifying specific clients and requesting payment of the associated referral fee. From June 2022 through May 2023, Cable issued 25 checks from his operating account to LMS. Those checks, totaling $190,900, represented the referral fees for more than 650 clients.

{¶ 17} In his responses to relator's letters of inquiry and/or his stipulations, Cable stated that while he acknowledges his duty as an attorney to fully understand

and comply with the Ohio Rules of Professional Conduct, he was naïve in failing to understand that those rules prohibit an attorney from paying a marketing company a fee for each referred client matter.

{¶ 18} The parties stipulated and the board found by clear and convincing evidence that Cable's conduct violated Prof.Cond.R. 7.2(b) (prohibiting a lawyer from giving anything of value to a person for recommending the lawyer's services with the exception of reasonable advertising costs, the usual charges of a legal-service plan, the usual charges of a qualifying nonprofit lawyer-referral service, or the sale of a law practice) and 7.3(a) (prohibiting a lawyer from soliciting professional employment by in-person, live telephone, or real-time-electronic contact when the lawyer's pecuniary gain is a significant motive, unless the person contacted is a lawyer or the person has a family, close personal, or prior professional relationship with the lawyer). We adopt these findings of misconduct.

### Count Two—Supervision of nonlawyer assistants

{¶ 19} Prof.Cond.R. 5.3 sets forth a lawyer's responsibilities regarding nonlawyer assistants. The rule requires a lawyer with managerial authority in a law firm to make reasonable efforts to ensure that the conduct of nonlawyers employed by, retained by, or associated with the lawyer is compatible with the professional obligations of the lawyer. *See* Prof.Cond.R. 5.3(a). The rule identifies two circumstances in which a lawyer is responsible for the conduct of a nonlawyer that would violate the Rules of Professional Conduct if undertaken by a lawyer. *See id.* Relevant here, under the first circumstance, a lawyer shall be responsible for the conduct of a nonlawyer when "the lawyer orders or, with the *knowledge* of the specific conduct, ratifies the conduct involved." Prof.Cond.R. 5.3(c)(1).

{¶ 20} Under Prof.Cond.R. 5.3(a), Cable had a duty to properly supervise the nonlawyer Bayshore representatives working on his behalf to ensure that their

6

conduct complied with the Rules of Professional Conduct.[1] Cable knew that Bayshore used police reports to identify accident victims and then contact those victims by telephone to solicit his legal representation. Cable should have known that live telephone solicitation of professional employment for pecuniary gain is prohibited by Prof.Cond.R. 7.3(a). He failed, however, to ensure that the nonlawyer Bayshore representatives complied with that rule. And he ratified their conduct by accepting the referrals generated by their violation of Prof.Cond.R. 7.3(a) for his own monetary gain.

{¶ 21} The parties stipulated and the board found by clear and convincing evidence that Cable's conduct violated Prof.Cond.R. 5.3(a) and 5.3(c)(1). We adopt these findings of misconduct.

### THE BOARD'S RECOMMENDED SANCTION

{¶ 22} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 23} As aggravating factors, the parties stipulated and the board found that Cable had acted with a dishonest or selfish motive and committed multiple offenses. *See* Gov.Bar R. V(13)(B)(2) and (4). The board also found it "troublesome" that Cable had allowed his clients to sign nonsolicitation agreements that he knew were inaccurate. The board did not consider that fact to be an additional aggravating factor but concluded that it did not support the sanction of a public reprimand.

{¶ 24} In mitigation, the parties stipulated and the board found that five factors were present: Cable's clean disciplinary record, his timely good-faith effort

---

1. Although Cable used two separate marketing firms that employed the same marketing techniques, in the second count of its complaint, relator charged Cable with misconduct arising only from his relationship with Bayshore.

to rectify the consequences of his misconduct, his full and free disclosure to the board and cooperation toward the disciplinary proceedings, persuasive evidence of his good character and reputation, *see* Gov.Bar R. V(13)(C)(1), (3), (4), and (5), and his demonstrated remorse and acceptance of full responsibility for his misconduct.

{¶ 25} In determining the appropriate sanction to recommend for Cable's misconduct, the board considered five cases advanced by the parties to support their proposed sanction of a public reprimand.

{¶ 26} In three of those cases, we publicly reprimanded lawyers who improperly solicited prospective clients or paid others for referring clients to them. *See Columbus Bar Assn. v. Bahan*, 2020-Ohio-434, ¶ 13, 25; *Lorain Cty. Bar Assn. v. Williamson*, 2017-Ohio-6963, ¶ 14; *Disciplinary Counsel v. Mason*, 2010-Ohio-1467, ¶ 9. However, in the other two cases, we imposed greater sanctions. *See Columbus Bar Assn. v. Willette*, 2008-Ohio-1198, ¶ 44, and *Cincinnati Bar Assn. v. Hoskins*, 2016-Ohio-4576, ¶ 44.

{¶ 27} The board, however, found another case—*Cincinnati Bar Assn. v. Haas*, 1998-Ohio-93—to be a more compelling precedent. In that case, we imposed a one-year suspension on an attorney who entered into an arrangement in which he received personal-injury referrals from an insurance salesman to whom he paid a portion of his fees at the conclusion of the case.

{¶ 28} The board in this case acknowledged that the primary purpose of attorney discipline "is not to punish the offender, but to protect the public," *Disciplinary Counsel v. O'Neill*, 2004-Ohio-4704, ¶ 53. It then relied on two additional factors to support its decision that a sanction greater than a public reprimand is necessary to protect the public.

{¶ 29} First, the board pointed to relator's assertion that, in the words of the board, the use of "pay-as-you-go referral companies is pervasive in Ohio." Relying on that assertion, the board stated that it "does not believe that a public reprimand

8

would be a sufficient deterrent to protect the public from the unscrupulous use of these 'marketing' firms," and it suggested that "a suspension is warranted."

{¶ 30} Second, the board expressed its concern that LMS's prelitigation-funding arm solicited Cable's clients to obtain high-cost loans in advance of receiving their legal settlements, requiring them to pay $1,000 for a $500 loan or $1,850 for a $1,000 loan. Cable acknowledged that he was aware of those solicitations and that he routinely advised his clients against obtaining those types of loans. Nevertheless, the record shows that LMS and Cable discussed the financial wisdom of LMS's advancing loans to some of Cable's clients. And the board determined that Cable's association with LMS further supports a sanction greater than a public reprimand.

{¶ 31} After comparing the facts of this case to those of *Bahan*, *Williamson*, *Mason*, *Willette*, *Hoskins*, and *Haas*, the board recommended that we suspend Cable from the practice of law for one year with the final six months stayed on the conditions that he refrain from further misconduct and pay the costs of these disciplinary proceedings. In addition, the board recommended that upon reinstatement, Cable be required to work with a monitoring attorney approved by relator, with monitoring focused on law-office management.

### CABLE'S OBJECTIONS TO THE BOARD'S REPORT

{¶ 32} Cable raises two objections to the board's report. In his first objection, he argues that based on the facts of this case and our precedent, the public reprimand advanced by the parties is the appropriate sanction for his misconduct. And in his second objection, he argues that the board improperly considered facts not in evidence to enhance the sanction it recommended. For ease of discussion, we address the objections out of order.

**The board improperly considered facts advanced in relator's**
**opening and closing statements to enhance its sanction recommendation**

{¶ 33} "It is well settled that statements made by counsel in opening statements and closing arguments are not evidence." *State v. Frazier*, 1995-Ohio-235, ¶ 92. In this case, relator's counsel made several statements in her opening and closing suggesting that attorneys' use of referral services like those at issue here is a widespread problem in Ohio. In her opening statement, she said, "[B]ased upon relator's other investigations, which are casually referred to in the complaint, [Cable] is not the only Ohio attorney participating in this conduct. It is widespread. It is prevalent." She further stated that the practice is generating "enormous amounts of money" for out-of-state solicitation companies and their associated chiropractors. And in her closing statement, relator's counsel reiterated that many Ohio attorneys use marketing firms like the ones Cable used and that this case presents "an opportunity to address that problem" by putting other attorneys on notice that the use of these firms is "sanctionable and violative of the [professional-conduct] rules." Relying on those statements, the board expressed doubt that a public reprimand would be "a sufficient deterrent to protect the public from the unscrupulous use of these 'marketing' firms," concluding that "a suspension is warranted."

{¶ 34} In his second objection, Cable contends that there was "no evidence, whatsoever, admitted into the record," let alone clear and convincing evidence, to establish that other Ohio attorneys are being confidentially investigated for engaging in misconduct similar to his own and that relator's statements should not be used to justify a greater sanction than the public reprimand proposed by the parties.

{¶ 35} Although counsel's opening and closing statements were not themselves evidence, it appears that the board used those statements to summarize what it believed the evidence and the position of the parties to be. We find that the

statements quoted by the board were supported by *some* record evidence. For example, the parties' stipulations and Cable's own testimony further suggested that Cable's misunderstanding of the rules regarding client referrals was formed by the conduct of several firms that employed him as a young lawyer. And the parties stipulated that Cable had "provid[ed] additional information and facts not initially known to relator regarding his use of Legal Management Services to refer clients which may be useful in future investigations." But the record evidence on those issues is not as persuasive as the statements made by relator's counsel in opening and closing arguments and is neither clear nor convincing.

{¶ 36} While the primary purpose of disciplinary sanctions is to protect the public, we have also recognized that those "sanctions also serve as a deterrent to similar violations by judges, lawyers, and judicial candidates in the future." *Disciplinary Counsel v. Horton*, 2019-Ohio-4139, ¶ 60, citing *In re Judicial Campaign Complaint Against Brigner*, 89 Ohio St.3d 1460, 1461 (2000), and *In re Judicial Campaign Complaint Against Morris*, 81 Ohio Misc.2d 64, 65 (1997). However, it is the conduct of the lawyer being disciplined, the ethical duties that that lawyer violated, the relevant aggravating and mitigating factors—all as determined from record evidence—and our precedent that govern our decision on the proper sanction to impose in a given case. Any opinions expressed by counsel in an opening statement or closing argument that are unsupported by clear and convincing record evidence should have no bearing on that calculus. Accordingly, we sustain Cable's second objection to the board's report and recommendation.

### The appropriate sanction for Cable's misconduct is a conditionally stayed one-year suspension

{¶ 37} In his first objection to the board's report, Cable challenges the board's recommendation that he serve a one-year suspension with six months conditionally stayed. Instead, he asserts that his immediate action to correct his misconduct once he realized the wrongfulness of his actions, his remorse, the

absence of harm to his clients, his full cooperation in relator's investigation, and our precedent demonstrate that the public reprimand jointly proposed by the parties is the appropriate sanction to be imposed in this case.

{¶ 38} In support of that sanction, Cable relies on the cases addressed in the board's report. He argues that his misconduct more closely aligns with the three cases in which we publicly reprimanded attorneys for paying for client referrals—*Bahan*, 2020-Ohio-434, *Williamson*, 2017-Ohio-6963, and *Mason*, 2010-Ohio-1467—and that the facts here can be distinguished from the facts in each of the cases in which we imposed greater sanctions—*Hoskins*, 2016-Ohio-4576, *Willette*, 2008-Ohio-1198, and *Haas*, 1998-Ohio-93.

{¶ 39} Relator joins Cable in advocating that we impose a public reprimand for the misconduct at issue here. We find, however, that Cable's misconduct occurred on a much greater scale than the misconduct of other attorneys who were publicly reprimanded for engaging in the improper solicitation of prospective clients or paying prohibited fees for the referral of clients to their law firms.

{¶ 40} The attorneys in *Bahan* and *Williamson* were each publicly reprimanded for improperly soliciting a single prospective client. On her own initiative, Bahan visited an incarcerated woman previously unknown to her who was facing criminal charges for murdering her own husband. Bahan gave the woman legal advice over the course of three visits and sought to be retained as her counsel. And when the woman did not retain her, Bahan billed her for the time she had spent on the case. Bahan's conduct resulted in a single violation of Prof.Cond.R. 7.3(a). *Id*. at ¶ 13.

{¶ 41} In *Williamson*, an attorney sent a letter to a single prospective client, falsely claiming that a notice of lis pendens had been filed regarding the prospective client's home, thereby making material misrepresentations to market her legal services. Although the letter included the words, "Advertising Material," the prospective client did not realize that the letter was an advertisement. We held that

Williamson violated professional-conduct rules that (1) prohibit a lawyer from making or using a false, misleading, or nonverifiable communication about the lawyer or the lawyer's services, (2) require a lawyer's written solicitation of employment to accurately and fully disclose the manner in which the lawyer learned of the identity and specific legal need of the prospective client, and (3) require a lawyer to verify that a prospective client named as a defendant in a civil suit has been served with notice of the action before soliciting professional employment from the prospective client. *Williamson,* 2017-Ohio-6963, at ¶ 5-6.

{¶ 42} In *Mason*, an attorney improperly paid for client referrals made to his law firm, though on a much smaller scale than Cable. In addition to his law firm, Mason owned and operated a consulting firm that provided occupational-safety- and employment-consulting services for employers. In a single year, the consulting firm paid one of its nonlawyer employees $69,600 for referring eight clients to Mason's law firm. Those referrals had generated nearly $487,000 in legal fees for the law firm. Mason stipulated that his payment of those fees violated Prof.Cond.R. 7.2(b), *Mason,* 2010-Ohio-1467, at ¶ 6—just one of the four rule violations that Cable has been found to have committed in this case.

{¶ 43} In contrast to Mason's payment of fees for receiving eight client referrals, Cable paid nearly $200,000 to two separate marketing firms to solicit prospective clients by telephone and refer hundreds of them to his law firm over the course of nearly a year. Cable violated professional-conduct rules prohibiting the payment of referral fees and the solicitation of prospective clients in person or by live telephone contact when a significant motive for that conduct is pecuniary gain. He also violated rules requiring him to make reasonable efforts to ensure that the conduct of the nonlawyers marketing his law firm comply with his professional obligations. Though his conduct resulted in just four rule violations, Cable's misconduct warrants more than a public reprimand.

**{¶ 44}** In *Hoskins*, we indefinitely suspended an attorney who, like Cable, paid a company for referring clients to his law firm. However, because Hoskins's contract obligated him to pay the referral company half the contingent fee he earned in each of the cases it had referred to him, his conduct also violated Prof.Cond.R. 5.4(a) (permitting a lawyer or law firm to share legal fees with a nonlawyer, including the sharing of legal fees with a nonprofit lawyer-referral service as defined in Gov.Bar R. XVI, only in limited circumstances). *Hoskins*, 2016-Ohio-4576, at ¶ 22-25.

**{¶ 45}** However, Hoskins also engaged in significant additional misconduct that is not present here by providing incompetent representation, neglecting legal matters, failing to reasonably communicate with clients, failing to deposit an unearned fee into his client trust account, and engaging in dishonest conduct during the ensuing disciplinary proceedings. Cable's misconduct does not rise to that level and does not warrant an indefinite suspension.

**{¶ 46}** In *Haas*, an attorney entered into an agreement with a nonattorney insurance salesman to refer personal-injury clients to him in exchange for a portion of his legal fee. For six years, Haas represented 20 to 30 clients referred to him by the salesman and paid the salesman over $22,000 for those referrals. In addition to violating rules of our former Code of Professional Responsibility comparable to Prof.Cond.R. 7.2(b) and 7.3(a)—two of the rules at issue in this case—Haas also violated a rule that prohibited the sharing of fees with a nonlawyer. *Haas*, 1998-Ohio-93, at ¶ 3. Like Cable, Haas had a clean disciplinary record, showed remorse for his conduct, and submitted evidence of his good character and reputation. *Id*. at ¶ 2.

**{¶ 47}** The board recommended that Haas be suspended from the practice of law for two years with one year stayed. *Id*. at ¶ 3. We compared Haas's misconduct to just two cases imposing indefinite suspensions on attorneys who had engaged in similar acts of misconduct—one of which involved improper telephone

14

solicitation and the conversion of client funds, *see Cincinnati Bar Assn. v. White*, 1997-Ohio-160, and the other involved solicitors traveling to active accident scenes to secure business for the attorney, *see Cincinnati Bar Assn. v. Rinderknecht*, 1997-Ohio-309. With those limited comparators, we rejected the board's recommended sanction and suspended Haas for one year with no stay. *Haas* at ¶ 5.

{¶ 48} *Willette*, 2008-Ohio-1198, offers additional perspective on the appropriate sanction for Cable's misconduct in this case. Willette contracted with an out-of-state marketing firm to sell living trusts on his behalf by direct mail and telephone solicitation in exchange for the lesser of $750 or 50 percent of the client's payment.

{¶ 49} The marketing was misleading and false and contained unverifiable statements. After agreeing to prepare a living trust for a married couple referred to him by the firm, Willette sent the clients' personal information to the firm without the clients' knowledge or consent. The firm prepared the trust document and sent it to Willette, who met with the clients to review and sign the document. During that meeting, Willette informed the clients that they needed to meet with another person, who would witness their signatures and explain the financial aspects of funding the trust. That person was an agent of the marketing firm who was compensated solely by commission for any insurance policies or annuities that he sold to the trust clients. After talking with him, the couple became suspicious and filed a grievance against Willette.

{¶ 50} We held that Willette violated ten disciplinary rules of our former Code of Professional Responsibility, including rules that prohibited a lawyer from (1) engaging in dishonesty, fraud, deceit, or misrepresentation, (2) using false, fraudulent, or misleading advertising, (3) soliciting legal business by telephone, (4) compensating an organization for a referral, (5) requesting that an organization recommend or promote use of the lawyer's services, (6) sharing a legal fee with a

nonlawyer, and (7) engaging in conduct that adversely reflects on the lawyer's fitness to practice law. *Willette*, 2008-Ohio-1198, at ¶ 14, 22, 26, 29, 31, 39.

{¶ 51} *Willette* does not address the number of clients referred to Willette as a result of the marketing scheme he entered into or the amount of the fees he paid for the client referrals he received under that scheme. While the scope of Cable's solicitation and payment of referral fees is problematic, it appears that Cable acted out of ignorance rather than dishonesty. Cable had been working as a sole practitioner for fewer than five years when he agreed to pay Bayshore and LMS for client referrals. Before then, he worked for several other law firms and was aware that they used marketing firms to obtain clients, though he was unfamiliar with the details of those arrangements. Throughout the course of these disciplinary proceedings, Cable explained that based on his experience with his prior employers and the representations made by Bayshore and LMS, he believed that the telephone-solicitation and referral arrangements were permissible (though the nonsolicitation agreement that the marketing firms had his clients sign certainly should have given him some pause). Indeed, one of his 12 character references, an attorney who had worked with Cable at one of those firms and has since left that firm too, reported, "[Cable] was taught things about marketing that I have no doubt contributed to any bad judgment for which he may have later become involved."

{¶ 52} Cable's ignorance does not excuse his misconduct. *See Disciplinary Counsel v. McCord*, 2009-Ohio-1517, ¶ 41. However, after the issues with Bayshore were brought to his attention, he retained legal counsel, fully acknowledged his wrongdoing, promptly terminated his marketing agreements, and expressed his intention to fully comply with all ethical rules governing the legal profession. He also disclosed to relator his improper relationship with LMS, giving relator information that will facilitate the investigation of other attorneys engaged in similar marketing schemes.

{¶ 53} Not only is there no evidence that any clients suffered tangible harm as a result of Cable's misconduct, but the clients interviewed by relator expressed that they were generally satisfied with Cable's legal representation. Cable's contingent fee was just 25 percent of his clients' recovery—less than the typical contingent fee—and he testified that he never received more in attorney fees than his clients were left with after paying that fee.

{¶ 54} Cable submitted 12 letters attesting to his good character—two from attorneys who have worked with him, several from former clients, and the remainder from family friends, most of whom have been represented by or have received legal advice from him. Those letters describe him as a man of the highest character who is known for his honesty, integrity, professionalism, and faith.

{¶ 55} Those factors, combined with Cable's clean disciplinary record, his overwhelming cooperation in relator's investigation of himself and others, his timely good-faith effort to rectify the consequences of his misconduct, his expressed remorse, and his reassurances that he will never again engage in this type of misconduct have persuaded us that Cable's actual time away from the practice of law is unnecessary to protect the public in this case. We therefore sustain Cable's first objection in part and find that a one-year suspension, stayed in its entirety on the conditions that he refrain from further misconduct, serve a one-year period of monitored probation focused on law-office management, and pay the costs of these proceedings, is the appropriate sanction for Cable's misconduct.

## CONCLUSION

{¶ 56} Accordingly, Brian Matthew Cable is suspended from the practice of law in Ohio for one year with the suspension fully stayed on the conditions that he (1) refrain from further misconduct, (2) serve a one-year period of monitored probation in accordance with Gov.Bar R. V(21), with monitoring focused on law-office management, and (3) pay the costs of these proceedings. If Cable fails to

comply with any condition of the stay, the stay will be lifted and he will serve the full one-year suspension.  Costs are taxed to Cable.

Judgment accordingly.

_____

**KENNEDY, C.J., joined by LELAND, J., concurring in part and dissenting in part.**

{¶ 57} I agree with the court's judgment that the conduct of respondent, Brian Matthew Cable, violated Prof.Cond.R. 7.2(b) (prohibiting a lawyer from giving anything of value to a person for recommending the lawyer's services with the exception of reasonable advertising costs, the usual charges of a legal-service plan, the usual charges of a qualifying nonprofit or lawyer-referral service, or the sale of a law practice), 7.3(a) (prohibiting a lawyer from soliciting professional employment by in-person, live-telephone, or real-time electronic contact when the lawyer's pecuniary gain is a significant motive, unless the person contacted is a lawyer or the person contacted has a family, close personal, or prior professional relationship with the lawyer), 5.3(a) (requiring a lawyer possessing managerial authority in a law firm to make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the conduct of a nonlawyer employed by, retained by, or associated with the lawyer is compatible with the professional obligations of the lawyer), and 5.3(c)(1) (requiring a lawyer to be responsible for the conduct of a nonlawyer employed by, retained by, or associated with the lawyer that would be a violation of the Ohio Rules of Professional Conduct if engaged in by a lawyer when the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved).

{¶ 58} I also agree with the majority that two aggravating factors are present here—that Cable acted with a dishonest or selfish motive and committed multiple offenses, *see* Gov.Bar R. V(13)(B)(2) and (4).  And I agree that five mitigating factors are present—that Cable had no prior disciplinary record, *see* Gov.Bar R.

V(13)(C)(1); made a timely, good-faith effort to rectify the consequences of his misconduct, *see* Gov.Bar R. V(13)(C)(3); made full and free disclosure to the Board of Professional Conduct and exhibited a cooperative attitude toward the disciplinary proceedings, *see* Gov.Bar R. V(13)(C)(4); presented evidence of his good character and reputation, *see* Gov.Bar R. V(13)(C)(5); and demonstrated remorse and acceptance of full responsibility for his misconduct.

**{¶ 59}** However, I part ways with the majority on its sanction of a fully stayed one-year suspension, because the facts of the cases the majority relies on to reach its decision are too dissimilar to the facts of this case. Based on *Cincinnati Bar Assn. v. Haas*, 1998-Ohio-93, I would impose a one-year suspension, and on Cable's return to the practice of law, I would require him to complete six hours of continuing legal education ("CLE") focused on ethics in addition to the CLE requirements under Gov.Bar R. X. And contrary to what the majority does here, I would not impose a one-year period of monitored probation, because Cable's misconduct was knowing and intentional, not negligent, and was not related to mismanagement of his law office.

**{¶ 60}** Accordingly, I concur in part and dissent in part.

### Cable's Misconduct

**{¶ 61}** Cable, a sole practitioner practicing personal-injury law, agreed to pay two companies to solicit and refer clients to him. Both companies purchased police reports to identify potential personal-injury clients, and nonlawyer representatives of both companies then solicited the accident victims by telephone and referred them to certain chiropractor clinics and attorneys, including Cable. Representatives of the companies would send to interested accident victims four documents, all of which bore Cable's firm letterhead and three of which Cable acknowledged that his office had prepared. The companies prepared the fourth document, which Cable admitted that he had reviewed.

**{¶ 62}** From October 2022 through April 2023, Cable issued three checks from his operating account to one of the companies; those checks totaled $8,325 and represented the referral fees for 111 client legal matters. From June 2022 through May 2023, Cable issued 25 checks from his operating account to the other company; those checks totaled $190,900 and represented the referral fees for more than 650 client legal matters.

**{¶ 63}** Further, Cable failed to supervise the nonlawyer representatives of one of the companies to ensure their compliance with the Ohio Rules of Professional Conduct, specifically that those representatives not violate Prof.Cond.R. 7.3(a) by using live telephone solicitation of professional employment for pecuniary gain. Cable knew that the representatives contacted accident victims by telephone to solicit his legal representation, and he ratified the representatives' conduct by accepting the referrals generated by their violation of Prof.Cond.R. 7.3(a) for his own monetary gain.

### Cases the Majority Relies On

**{¶ 64}** The majority relies on five cases in support of the sanction it imposes: *Columbus Bar Assn. v. Bahan*, 2020-Ohio-434; *Lorain Cty. Bar Assn. v. Williamson*, 2017-Ohio-6963; *Disciplinary Counsel v. Mason*, 2010-Ohio-1467; *Columbus Bar Assn. v. Willette*, 2008-Ohio-1198; and *Cincinnati Bar Assn. v. Hoskins*, 2016-Ohio-4576. In my view, the starting point in imposing an appropriate sanction in a disciplinary case is to first consider the *nature* of the misconduct, then the rules violated. Three of the cases the majority relies on— *Bahan*, *Williamson*, and *Mason*—involve solicitation of professional employment. But in *Bahan* and *Williamson*, the solicitation involved was a singular event, and in *Mason*, it involved eight such instances. Cable's misconduct, by contrast, was long-term and widespread, involving two different referral companies, more than 760 referrals, and nearly $200,000 in paid referral fees, all over the course of about a year.

**{¶ 65}** In *Bahan*, on one in-person occasion, Bahan solicited her professional employment for pecuniary gain in violation of Prof.Cond.R. 7.3(a). *Bahan* at ¶ 2-3 (lead opinion). Bahan read about Rosalie Kennedy's arrest on the internet, and despite not being contacted by Kennedy or anyone on Kennedy's behalf, Bahan went to the Logan County Jail to solicit representation of Kennedy.

**{¶ 66}** In *Williamson*, on one occasion, Williamson sent a letter to David Chopcinski, which included language indicating that it was an advertisement. However, the letter included material misrepresentations of fact and law in an attempt to market the services of Williamson's law firm and failed to accurately and fully disclose how Williamson had become aware of Chopcinksi's identity and legal needs. Williamson also failed to verify that Chopcinksi had been served with notice of a foreclosure complaint before sending the letter. This court found that Williamson's conduct violated Prof.Cond.R. 7.1 (prohibiting a lawyer from making or using a false, misleading, or nonverifiable communication about the lawyer or the lawyer's services), 7.3(c)(1) (requiring that a written communication from a lawyer soliciting professional employment from a prospective client disclose accurately and fully the manner in which the lawyer became aware of the identity and specific legal need of the addressee), and 7.3(d) (requiring that a lawyer verify that a prospective client who has been named as a defendant in a civil suit was served with notice of the action prior to the lawyer's making any written solicitation of professional employment to the prospective client). *Williamson* at ¶ 5-7.

**{¶ 67}** In *Mason*, Mason was the principal of Mason Law Firm Co., L.P.A. ("Mason Law") and the owner of and general counsel for Midwest Management Consultants, Inc. ("Midwest Management"). William Wheeler, a nonlawyer, was employed at Midwest Management as a "'registered persuader'—a person who speaks directly with company employees to promote union avoidance." *Mason*, 2010-Ohio-1467, at ¶ 3. In 2007, Wheeler received more compensation than his employment agreement entitled him to. The difference between the amount of

compensation Wheeler should have received and did receive was $69,582.57. That amount represented referral fees that Midwest Management paid Wheeler for eight clients that he referred to Mason Law. This court held that Mason's conduct in paying Wheeler the referral fees violated Prof.Cond.R. 7.2(b). *Id.* at ¶ 8.

**{¶ 68}** Cable's misconduct is more closely aligned to the misconduct at issue in *Haas*, 1998-Ohio-93; *Willette*, 2008-Ohio-1198; and *Hoskins*, 2016-Ohio-4576. The attorney in each of those cases had a widespread solicitation scheme.

**{¶ 69}** In *Haas*, Haas entered an arrangement with James Hearn, an insurance salesman who was not a lawyer. Hearn would refer personal-injury claimants to Haas, and in return, Haas would pay Hearn a portion of the fees earned at the conclusion of the case. Over six years, Haas represented 20 to 30 of the persons referred to him by Hearn and paid Hearn $22,160.38. After considering Haas's remorse and exemplary record, and because there were no additional ethical-rule violations compared to other cases in which this court had imposed an indefinite suspension on attorneys who paid nonlawyers for referrals, this court imposed a one-year suspension from the practice of law. *Haas* at ¶ 5.

**{¶ 70}** In *Willette*, Willette entered a contract with Estate Planning Legal Services ("Estate Planning"), a Michigan law firm, to market and sell estate-planning services in Ohio. The contract provided that Estate Planning would be Willette's exclusive agent for marketing, sales, and preparing estate-planning packages. The contract also required that, for any clients Estate Planning referred to Willette, he pay Estate Planning the lesser of $750 or 50 percent of the client's fee. Estate Planning used direct-mail and telephone solicitations to contact prospective clients on Willette's behalf. After contacting prospective clients, Estate Planning would refer them to Willette and a meeting would be arranged between the prospective clients and Willette.

**{¶ 71}** In 2004, after a telephone solicitation of Dr. B. Dale Trott and his wife, Betty, Willette met with the Trotts, and they agreed to have Willette prepare

a living trust for them for a fee.  Without the Trotts' knowledge or consent, Willette forwarded their personal and financial information to Estate Planning, and Estate Planning then drafted the trust document.  Once the trust document was returned to Willette, he met with the Trotts and informed them that they would need to meet with another person who would witness their signatures and advise them on funding the trust.  The Trotts were later contacted by Larry Spencer, an agent of Estate Planning who was paid a commission based on any insurance policies or annuities he was able to sell to trust clients.  After the Trotts spoke with Spencer, they became suspicious and filed a grievance.

{¶ 72} After considering Willette's "fail[ure] to recognize the dangers inherent" in forming a business relationship with Estate Planning, *Willette*, 2008-Ohio-1198, at ¶ 39, his inconsistent testimony to avoid responsibility for his misconduct, *id*., and the harm caused to the Trotts, *id*. at ¶ 43, this court imposed a one-year suspension from the practice of law with six months stayed, *id*. at ¶ 44.

{¶ 73} In *Hoskins*, Hoskins contracted to accept the referral of Social Security disability cases from Citizens Disability, L.L.C. ("Citizens"), a Massachusetts limited-liability company that advertised itself as a "national disability advocacy group," *Hoskins*, 2016-Ohio-4576, at ¶ 21.  Hoskins paid Citizens half of the 25 percent contingency fee that he received in the cases Citizens referred to him.  Their written agreement also required Hoskins to pay a fee not to exceed $3,000 per case for "advertising, screening, and other case assistance."  *Id*.  This court found that Hoskins's relationship with Citizens violated Prof.Cond.R. 5.4(a) (prohibiting a lawyer from sharing legal fees with a nonlawyer except in certain enumerated circumstances) and 7.2(b)(3).  *Id.* at ¶ 25.  In addition to these violations, this court also found that Hoskins committed 20 other ethical-rule violations based on multiple other counts of misconduct.  *Id*. at ¶ 14, 18, 20, 28-29, and 36.

{¶ 74} The board found, and this court agreed, that there were no mitigating factors. *See id*. at ¶ 38 and 43-44. The board also found, and this court agreed, that there were aggravating factors of a prior disciplinary record, engaging in multiple counts of misconduct, refusing to acknowledge the wrongful nature of the conduct, failing to make timely restitution, submitting false statements or engaging in other deceptive practices during the disciplinary proceedings, and failing to cooperate in the disciplinary process. *See id.* This court further held that Hoskins had failed to appreciate the magnitude of his misconduct, that his misconduct demonstrated a pattern of neglect, that he had failed to comply with court orders, and that he had a propensity to engage in dishonesty. *Id.* at ¶ 43. Given the nature and breadth of Hoskins's misconduct, this court imposed an indefinite suspension from the practice of law. *Id*. at ¶ 43-44. And in the event Hoskins petitioned for reinstatement to the practice of law, this court conditioned his reinstatement on complying with the requirements set forth in Gov.Bar R. V(25), completing a CLE course focused on law-office management, obtaining a passing score on the Multistate Professional Responsibility Examination, and paying the costs of the disciplinary proceedings. *Id*. at ¶ 44.

## A One-year Suspension Is the Appropriate Sanction to Impose for Cable's Misconduct

{¶ 75} After reviewing the cases the majority relies on, I find that Cable's misconduct and the aggravating and mitigating factors involved are most aligned with *Haas*, 1998-Ohio-93. Therefore, like in *Haas*, I would impose a one-year suspension, and upon Cable's return to the practice of law, I would require him to complete six hours of CLE focused on ethics in addition to the CLE requirements under Gov.Bar R. X.

{¶ 76} And contrary to the majority, I would not impose a term of monitored probation. Cable's ethical-rule violations did not involve mismanagement of his office or his law practice. "Monitored probation is a

24

valuable tool in Ohio's discipline system; it enables us to protect the public while educating the attorney and correcting the underlying misconduct." *Disciplinary Counsel v. Halligan*, 2019-Ohio-3748, ¶ 41 (Kennedy, J., concurring in part and dissenting in part). But there is nothing to correct here except for Cable to terminate his solicitation and referral fee-sharing relationships.

**{¶ 77}** For these reasons, I concur in part and dissent in part.

_____

Kent R. Markus and Holly N. Wolf, Bar Counsel, and Timothy L. Van Eman, for relator.

Koblentz, Penvose, & Froning, L.L.C., Richard S. Koblentz, Bryan L. Penvose, and Nicholas E. Froning, for respondent.

_____